IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

APRIL LILY MARTINEZ,

    Plaintiff,

v.                                                                                                                1:20-cv-00662-LF

KILOLO KIJAKAZI,[1] Acting Commissioner
of the Social Security Administration,

    Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on plaintiff April Lily Martinez's Motion to Reverse and Remand for a Rehearing with Supporting Memorandum (Doc. 21), which was fully briefed on June 21, 2021. *See* Docs. 25, 26, 27. The parties consented to my entering final judgment in this case. Docs. 4, 7, 8. Having meticulously reviewed the entire record and being fully advised in the premises, I find that the ALJ erred by failing to consider Ms. Martinez's endometriosis and related pain in formulating her residual functional capacity ("RFC"). I therefore GRANT Ms. Martinez's motion and remand this case to the Commissioner for further proceedings consistent with this opinion.

### I.    Standard of Review

The standard of review in a Social Security appeal is whether the Commissioner's final decision[2] is supported by substantial evidence and whether the correct legal standards were applied. *Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008). If substantial evidence supports

---

[1] Kilolo Kijakazi became the Acting Commissioner of the Social Security Administration on July 9, 2021, and is automatically substituted as the defendant in this action. FED. R. CIV. P. 25(d).

[2] The Court's review is limited to the Commissioner's final decision, 42 U.S.C. § 405(g), which generally is the ALJ's decision, 20 C.F.R. §§ 404.981, 416.1481, as it is in this case.

the Commissioner's findings and the correct legal standards were applied, the Commissioner's decision stands, and the plaintiff is not entitled to relief. *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). "The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (internal quotation marks and brackets omitted). The Court must meticulously review the entire record, but may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118. A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Id.* While the Court may not reweigh the evidence or try the issues de novo, its examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005). "'The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the] findings from being supported by substantial evidence.'" *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (quoting *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

## II. Applicable Law and Sequential Evaluation Process

To qualify for disability benefits, a claimant must establish that he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a).

When considering a disability application, the Commissioner is required to use a five-step sequential evaluation process.  20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).  At the first four steps of the evaluation process, the claimant must show: (1) the claimant is not engaged in "substantial gainful activity"; (2) the claimant has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; *and* (3) the impairment(s) either meet or equal one of the Listings[3] of presumptively disabling impairments; *or* (4) the claimant is unable to perform his or her "past relevant work."  20 C.F.R. §§ 404.1520(a)(4)(i–iv), 416.920(a)(4)(i–iv); *Grogan*, 399 F.3d at 1260–61.  If the claimant cannot show that his or her impairment meets or equals a Listing but proves that he or she is unable to perform his or her "past relevant work," the burden of proof shifts to the Commissioner, at step five, to show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience.  *Id.*

### III.   Background and Procedural History

Ms. Martinez was born in 1984, dropped out of high school in the middle of the twelfth grade after having a baby, and worked as a cashier, corrections officer, security officer, and an in-home caretaker for her father.  AR 248–53, 526, 543.[4]  Ms. Martinez filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") in November of 2017, alleging disability since October 1, 2015 due to severe anxiety and nervousness, chronic depression, crying spells, mood swings, endometriosis, osteoarthritis, chronic low back pain,

---

[3] 20 C.F.R. pt. 404, subpt. P, app. 1.

[4] Documents 16-1 through 16-10 comprise the sealed Administrative Record ("AR").  When citing to the record, the Court cites to the AR's internal pagination in the lower right-hand corner of each page, rather than to the CM/ECF document number and page.

degenerative herniated bulging disc, pelvic congestion syndrome, pelvic vein incompetence, and insomnia.  AR 471–500, 541.  The Social Security Administration ("SSA") denied her claims initially on March 2, 2018.  AR 384–91.  The SSA denied her claims on reconsideration on July 2, 2018.  AR 394–405.  Ms. Martinez requested a hearing before an ALJ.  AR 406–07.  On April 16, 2019, ALJ Michelle Lindsay held a hearing.  AR 244–78.  ALJ Lindsay issued her unfavorable decision on July 9, 2019.  AR 353–74.

The ALJ found that Ms. Martinez met the insured status requirements of the Social Security Act through December 31, 2022.  AR 359.  At step one, the ALJ found that Ms. Martinez had not engaged in substantial, gainful activity since October 1, 2015, her alleged onset date.  *Id.*  At step two, the ALJ found that Ms. Martinez had the following severe impairments: "degenerative disc disease of the lumbar spine with no direct imaging evidence of neural impingement; major depressive disorder; anxiety; and obesity."  *Id.*  The ALJ found that Ms. Martinez's endometriosis was a non-severe impairment.  *Id.*

At step three, the ALJ found that none of Ms. Martinez's impairments, alone or in combination, met or medically equaled a Listing.  AR 359–61.  Because the ALJ found that none of the impairments met a Listing, the ALJ assessed Ms. Martinez's RFC.  AR 361–66.  The ALJ found Ms. Martinez had the RFC to

> to perform a limited range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a).  The claimant is able to lift, carry, push, and pull up to ten pounds on an occasional basis, sit for at least six hours in an eight-hour workday, and stand and walk for two hours in an eight-hour workday.  She can occasionally climb stairs and ramps, balance, stoop, crouch, kneel, and crawl, but can never climb ladders, ropes, or scaffolds.  She must avoid more than occasional exposure to extreme cold.  She must completely avoid unprotected heights.  She is able to understand, remember, and carry out simple instructions, and is able to maintain attention and concentration to perform and persist at simple tasks for two hours at a time without requiring redirection to task.  She can have occasional contact with the general public and superficial interactions with coworkers and supervisors.

> She requires work involving no more than occasional change in the routine work setting, and no more than occasional independent goal setting or planning.

AR 361.

At step four, the ALJ found that Ms. Martinez could not perform any of her past relevant work as a caregiver, cashier, corrections specialist, stocker, or security guard. AR 366. The ALJ found Ms. Martinez not disabled at step five because she could perform jobs that exist in significant numbers in the national economy—such as addresser, table worker, and pneumatic tube operator. AR 367. Ms. Martinez requested review by the Appeals Council. AR 460–65. On May 8, 2020, the Appeals Council denied the request for review. AR 375–81. Ms. Martinez timely filed her appeal to this Court on July 7, 2020. Doc. 1.[5]

### IV.     Ms. Martinez's Claims

Ms. Martinez raises two arguments for reversing and remanding this case: (1) the ALJ failed to properly evaluate the opinion of her treating physician, Dr. Mustapha Kamel Abouda; and (2) the ALJ's RFC is not based on substantial evidence because the ALJ committed legal error by failing to account for her endometriosis and subjective allegations of pain in formulating her RFC. *See* Doc. 21 at 2, 13–21; Doc. 26. In her reply, Ms. Martinez concedes the first argument. Doc. 26 at 2. The Court therefore only addresses the second argument. The Court remands because the ALJ erred by failing to consider Ms. Martinez's endometriosis and related pain in formulating her RFC.

### V.      Analysis

Ms. Martinez argues that the ALJ failed to account for her "subjective allegations of pain and other symptoms" in formulating her RFC. Doc. 21 at 22. Specifically, she argues that the

---

[5] A claimant has 60 days to file an appeal. The 60 days begins running five days after the decision is mailed. 20 C.F.R. §§ 404.981, 416.1481; *see also* AR 377.

ALJ failed to consider her allegations of disabling pain connected to her diagnoses of pelvic congestion syndrome and endometriosis. *Id*. at 24; Doc. 26 at 2–3. The Commissioner argues that the ALJ reasonably found Ms. Martinez's "subjective symptom statements were inconsistent with the other record evidence." Doc. 25 at 16. The Commissioner asserts that the ALJ found Ms. Martinez's allegations about pain and other symptoms "inconsistent with the medical evidence," and that her pain, depression, and anxiety were managed with treatment and medication. *Id*. at 17. The Commissioner offers no explanation, however, of how the ALJ considered Ms. Martinez's endometriosis and connected symptoms when formulating her RFC. *See id*. at 16–19. Having reviewed the briefing and the relevant evidence, the Court finds that the ALJ failed to consider Ms. Martinez's endometriosis when assessing her RFC. This is legal error that requires remand.

An ALJ must consider all of a claimant's medically determinable impairments, including those that are not severe, when assessing a claimant's RFC. 20 C.F.R. § 404.1545(a)(2). In addition, an ALJ must "consider the limiting effects of all [a claimant's] impairment(s), even those that are not severe, in determining [a claimant's RFC]." 20 C.F.R. § 404.1545(e). "While a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim." SSR 96–8p, 1996 WL 374184, at *5 (July 2, 1996). An ALJ may not "simply rely on [a] finding of non-severity [at step two] as a substitute for a proper RFC analysis." *Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013) (citing SSR 96-8p, 1996 WL 374184, at *4). "In all cases in which symptoms, such as pain, are alleged, the RFC assessment must[] [c]ontain a thorough discussion and analysis of the objective

6

medical and other evidence, including the individual's complaints of pain and other symptoms." SSR 96-8p, 1996 WL 374184, at *7.

An ALJ's failure to consider nonsevere impairments in formulating a claimant's RFC, and at steps four and five of the sequential evaluation process, is legal error requiring remand. *Wells*, 727 F.3d at 1069 (ALJ's exclusion of non-severe impairments in assessing claimant's RFC based on a step-two finding of non-severity was "inadequate under the regulations and the Commissioner's procedures"); *see also McFerran v. Astrue*, 437 F. App'x 634, 638 (10th Cir. 2011) (unpublished) ("[W]e cannot conclude that the Commissioner applied the correct legal standards" where "ALJ made no findings on what, if any, work-related limitations resulted from [claimant's] nonsevere mood disorder and chronic pain. He did not include any such limitations in . . . his RFC determination[,] . . . [n]or did he explain why he excluded them."); *Grotendorst v. Astrue,* 370 F. App'x 879, 884 (10th Cir. 2010) (unpublished) ("[O]nce the ALJ decided . . . that [claimant's] mental impairments were not severe, she gave those impairments no further consideration. This was reversible error.").

The medical records in this case document Ms. Martinez's repeated treatment for pelvic pain and endometriosis:

- On July 29, 2011, Ms. Martinez had a pelvic ultrasound, which showed "prominent peripheralizing vessels about the uterus, a finding which can be seen with pelvic congestion syndrome."[6] AR 683.
- On August 12, 2011, Ms. Martinez had laparoscopic biopsies to check for endometriosis. AR 1296. The biopsies showed "peritoneal tissue foci consistent with endometriosis" and "proliferative endometrium with no pathologic abnormality." AR 1297.

---

[6] "Pelvic congestion syndrome (PCS) is [a] pelvic venous syndrome. . . . [and] is a common cause of chronic pelvic pain in women of reproductive age. Pain that is intermittent or constant lasting for 3–6 months, present in the pelvic or abdominal region, occurring throughout the menstrual cycle, and without any association with pregnancy is chronic pelvic pain." Omer Saadat Cheema & Paramvir Singh, *Pelvic Congestion Syndrome,* StatPearls [Internet] (available at https://www.ncbi.nlm.nih.gov/books/NBK560790/ (last visited Sept. 16, 2021).

7

- On December 5, 2012, Ms. Martinez saw Lynore M. Martinez, MD for a consultation regarding her endometriosis. AR 979–81. Dr. Martinez noted that Dr. Rodriguez had performed surgery on Ms. Martinez for endometriosis and ovarian cysts and prescribed Lupron,[7] which provided relief for approximately three months. In addition, Dr. Burdick treated Ms. Martinez for pelvic congestion syndrome, inserting coils into her pelvic vessels in May and July of 2012. Dr. Martinez diagnosed her with endometriosis of pelvic peritoneum and prescribed Camrese, a low dose oral contraceptive. AR 981. Dr. Martinez also assessed procreative management as Ms. Martinez was interested in artificial insemination and pregnancy. *Id*.
- On January 17, 2013, Ms. Martinez saw Dr. Martinez to confirm that she was pregnant. AR 977. Throughout 2013, Ms. Martinez continued to see Dr. Martinez for treatment of her endometriosis, prenatal care, pregnancy assessments, and postpartum care. *See* AR 911–76.
- On September 26, 2013, after giving birth, Ms. Martinez saw a nurse practitioner at Dr. Martinez's office for pelvic pain due to endometriosis. AR 916–17. She reported bilateral pelvic pain, which was constant and sharp, had been present between 2 and 4 weeks, and rated a 10 out of 10 on the pain scale. AR 917. The provider diagnosed her with endometriosis of pelvic peritoneum, and re-started her on Camrese. AR 919.
- On October 3, 2013, at her six-week postpartum visit, Ms. Martinez deferred a pelvic examination to the following visit to allow her time to start the Camrese to manage her endometriosis pain. AR 916.
- On October 10, 2013, Dr. Martinez noted that all narcotic pain management needed to be handled by her primary doctor, Dr. Abouda, and stated that she would send Dr. Abouda a letter stating the same. AR 913. Dr. Martinez advised Ms. Martinez to return in 3 months after continuous dosing with Camrese to re-assess her pain from endometriosis. *Id*.
- On January 17, 2014, Ms. Martinez reported bilateral pelvic pain, and reported that she had discontinued Camrese after one month due to bleeding. AR 909. Dr. Martinez prescribed Amethia, a higher dose oral contraceptive, and advised Ms. Martinez to stay on this medication for at least three months for relief of pain. AR 909–10.
- On March 20, 2014, Dr. Abouda noted that Ms. Martinez was having "severe pelvic pain" from periods and she appeared "in the very discomfort" [sic]. AR 840. Dr. Abouda gave Ms. Martinez a Toradol shot for her endometriosis pain. *Id*. He recommended that she follow up with an OB/GYN or the ER if this did not relieve her pain. *Id*.
- On April 7, 2014, Ms. Martinez saw Dr. Martinez for an endometriosis follow up appointment. AR 906. Ms. Martinez reported that her primary care doctor, Dr. Abouda, was not comfortable prescribing additional pain medication for management of her pain from endometriosis, and that Dr. Abouda wanted to refer her to a pain management clinic. *Id*. Dr. Martinez noted that she would send a letter to Dr. Abouda to see if he was comfortable increasing her oxycodone dose while she was treating her

---

[7] Lupron (or leuprolide) is a synthetic hormone that decreases estrogen levels in the body and is used to treat pain due to endometriosis. *Leuprolide*, Mayo Clinic, available at https://www.mayoclinic.org/drugs-supplements/leuprolide-intradermal-route-intramuscular-route-subcutaneous-route/description/drg-20067038 (last visited Sept. 16, 2021).

endometriosis "with more conservative therapy." AR 908. Dr. Martinez further noted that if Ms. Martinez's pain continued to worsen, she would consider laparoscopy or Lupron. *Id*.

- On April 21, 2014, Dr. Martinez referred Ms. Martinez to a pain management clinic. AR 1072–73. Dr. Martinez noted in the referral that Ms. Martinez had chronic back pain and was being treated by Dr. Abouda "with Percocet 10 mg every 6 hours daily" but was having "increased pain with endometriosis for 7–10 days per month" and needed an increased dose of Percocet for pain management to deal with the pain from her endometriosis. AR 1073.
- On May 5, 2014, Dr. Abouda noted that Ms. Martinez's back pain was fairly controlled, but that she needed "extra oxycodone for pain control during the 7 days of her periods due to endometriosis." AR 834. Dr. Abouda prescribed oxycodone 10 mg twice a day for her endometriosis pain, in addition to the oxycodone-acetaminophen 10-325 MG tablets that she was taking four times a day for her back pain. AR 835.
- On May 7, 2014, Ms. Martinez told Dr. Martinez that she was having a hard time finding a pain management specialist. AR 904. Dr. Martinez advised Ms. Martinez that due to law changes, only one physician could prescribe narcotic pain medication. *Id*. Dr. Martinez noted that the oral contraceptives and ibuprofen were not adequately controlling her pain from endometriosis, and that Dr. Abouda had not contacted her to discuss the additional pain medication needed during her menses. AR 905.
- On June 19, 2014, Ms. Martinez reported multiple menses the previous month, and stated that she had an appointment with a pain specialist in Albuquerque, but that there was a long wait for new patients. AR 901. On this visit, Dr. Martinez wrote Ms. Martinez a prescription for additional Percocet to be taken during her menstrual cycles to manage her pain. AR 903. Dr. Martinez also increased the dose of her oral contraceptives and prescribed Lupron to manage Ms. Martinez's endometriosis pain. AR 903.
- On July 21, 2014, Ms. Martinez saw Dr. Martinez, and brought her Lupron prescription from the pharmacy to be injected at the office. AR 897–98. Dr. Martinez administered the Lupron injection and prescribed an additional 30 tablets of oxycodone for management of pain from endometriosis. AR 900.
- On July 28, 2014, Ms. Martinez stated that she felt "as if her ovaries [were] being twisted and [that] the pain [was] increasing as time passes." AR 894. She reported a pain level of 9 out of 10 despite taking oxycodone 10 mg every 4 hours and ibuprofen three times per day. *Id*. Dr. Martinez advised Ms. Martinez that severe pain was expected with the initiation of Lupron therapy. AR 896. Dr. Martinez prescribed 60 Percocet tablets to last the next 10 days, and administered a shot of Toradol. *Id*.
- On August 6, 2014, Ms. Martinez saw Dr. Martinez for severe pain, which she rated as a 12 out of 10. AR 891. Dr. Martinez noted that Ms. Martinez had started a heavy painful menses the previous night, and that she was "writhing in pain." *Id*. Dr. Martinez sent Ms. Martinez to the emergency room for treatment, prescribed an additional 30 oxycodone, noted that she had an allergic reaction to Toradol, and noted that Ms. Martinez might need to consider getting a hysterectomy. *Id*.
- On August 13, 2014, Ms. Martinez saw Dr. Abouda to discuss hypothyroidism and pelvic pain. AR 832–33. Dr. Abouda noted that "[h]er pelvic pain due to endometriosis has been fairly controlled" and refilled her oxycodone prescription. *Id*.

9

- On August 14, 2014, Ms. Martinez reported to Dr. Martinez that her pain "was much better" and that she was "getting pain under control." AR 889. Ms. Martinez advised Dr. Martinez that she had not been evaluated in the emergency room because the ER told her they had not received a call from Dr. Martinez "despite [Dr. Martinez] calling the charge nurse at the ER." *Id.*
- On August 27, 2014, Ms. Martinez saw Dr. Abouda, who had called her after finding out she was getting pain medication from her gynecologist as well as from him. AR 830. Dr. Abouda advised her that she could only get pain medication from his office, and he increased the amount of pain medication he was prescribing so that she could "take one extra pill during her periods of menstrual periods." AR 831.
- On November 12, 2014, Ms. Martinez reported to Dr. Martinez that she had had a lot of bleeding, lasting 17 days. AR 886. Ms. Martinez stated that Dr. Abouda was prescribing additional pain medication to manage her pain from her endometriosis. *Id.* Dr. Martinez prescribed oral Toradol (ketorolac) and intramuscular Toradol for severe endometriosis flares. AR 888. Dr. Martinez also restarted Ms. Martinez on continuous oral contraceptives, prescribed Zofran for management of her nausea, and discussed the options of getting a hysterectomy and having a "repeat laparoscopy for removal of visible endometriosis." *Id.*
- On December 10, 2014, Ms. Martinez saw pain management specialist Dr. David A. Woog. AR 1312. Dr. Woog noted that Ms. Martinez had a "complex history [of] abdominal, pelvic, and back pain. [She] [h]as had extensive work up for endometriosis including laparoscopy; now managed with medications with approximately 12 painful days per cycle." *Id.* Dr. Woog noted that Ms. Martinez's pain was "constant" and her average pain level was 7 out of 10. *Id.* Ms. Martinez rated her pain as 8 out of 10 at this visit. *Id.* Dr. Woog noted that Ms. Martinez had tried multiple medications and treatment modalities for pain relief: "Tylenol, [i]buprofen, opioids, steroids, muscle relaxers," as well as physical therapy, massage, chiropractic, spine surgery, injections, and the emergency room. *Id.* Dr. Woog assessed Ms. Martinez with lumbosacral spondylosis, long-term opiate use, and chronic female pelvic pain. AR 1313. For treating her "chronic female pelvic pain," Dr. Woog prescribed Oxycodone HCL tablets,[8] 10 MG, 1 tablet every 4-6 hours and started her on gabapentin[9] capsules, 100 MG, with dosage increasing every week for three weeks. AR 1313.
- On December 14, 2017, Ms. Martinez reported to Dr. Martinez having heavy menses that lasted 8 days, and occurred every 12–15 days. AR 882. Ms. Martinez reported that she had been seeing Dr. Abouda who had prescribed her oxycodone 10/325 4 times per day and 20 mg. 3 times per day. *Id.* This daily dose of 100 mg per day was controlling

---

[8] As a pain management specialist, Dr. Woog assumed responsibility for prescribing Ms. Martinez's opioid pain medications. AR 1312.

[9] "Gabapentin is approved to treat the type of nerve pain (neuralgia) that results from nerve damage. . . . The exact way that gabapentin works to relieve pain is not known. It may change the way the body senses and reacts to pain. Gabapentin is used to manage long-term (chronic) pain, not to be taken for pain as needed." *Does gabapentin help nerve pain*, Chao, Sally, MD, available at https://www.drugs.com/medical-answers/gabapentin-nerve-pain-3557479/ (last visited Sept. 16, 2021).

her pain, but causing depression. *Id*. Ms. Martinez reported that lower doses of oxycodone had not been effective at managing the pain, but sought Dr. Martinez's assistance in getting off pain medication and managing the increased pain during the week prior and during her menses. *Id*. Dr. Martinez diagnosed Ms. Martinez with endometriosis and pain in pelvis, restarted Ms. Martinez on oral contraceptives, and discussed repeating laparoscopy for endometriosis. AR 885.

- On April 23, 2018, Ms. Martinez saw Dr. Martinez for a follow up on her pelvic pain. AR 1331–34. Dr. Martinez noted the following: "Pt did not start OCP as it was not covered by her insurance. Pt has been managing pain w/pain meds and rest. Pt lost her job as pain has been intense. Pt would like to see if there are any studies or trials for her endometriosis. Pt states menses is irregular and coming in longer intervals." AR 1333. Dr. Martinez noted that Ms. Martinez had chronic pain due to endometriosis, advised her to take oral contraceptives continuously for three months, and discussed option of doing ongoing Lupron injections, despite risks of osteoporosis with this treatment. AR 1334.
- On June 11, 2018, Dr. Martinez started Ms. Martinez on monthly injections of Lupron for management of her endometriosis. AR 1538. Dr. Martinez advised Ms. Martinez that this was an "off label" use of Lupron, and that it was advised to use only for six months. *Id*.
- On July 23, 2018, Ms. Martinez stated that her pain had improved, and that she had discontinued oral contraceptives after her Lupron injection. AR 1535. Ms. Martinez reported a menses that lasted 9 days and was heavy. *Id*.
- On August 30, 2018, Dr. Martinez gave Ms. Martinez another Lupron injection. AR 1533.
- On September 29, 2018, Dr. Martinez gave Ms. Martinez another Lupron injection. AR 1531.
- On October 15, 2018, Ms. Martinez advised Dr. Martinez that she had a lot of joint pain with Lupron, as well as intermittent cramping, hot flushes, and anxiety about pain returning. AR 1526. Ms. Martinez asked to transition from Lupron to Orlissa, which Dr. Martinez prescribed. AR 1528. Dr. Martinez noted that Ms. Martinez's endometriosis was in "much better control," and that she would try to get a prior authorization on Orlissa. AR 1526.
- On November 29, 2018, Ms. Martinez advised Dr. Martinez that her pain had been manageable since her Lupron injection six weeks prior. AR 1523. She stated that she had not been able to fill the prescription for Orlissa, despite signing up for the program to get it. *Id*. Ms. Martinez reported that she had a "bad day last month" with pain that "feels like contraction type pain" but reported that she could breathe through the pain. *Id*. Although Ms. Martinez stated that her moods had been better on Lupron, she stated that her "mood changes were recurring." *Id*. Dr. Martinez started Ms. Martinez on oral contraceptives until the Orlissa could be approved. AR 1525.
- On January 14, 2019, Ms. Martinez saw Dr. Martinez for a follow up on her endometriosis and reported "persistent vomiting due to heavy bleeding which lasted 14 days." AR 1520. Dr. Martinez prescribed ibuprofen and Zofran because Ms. Martinez was "so dehydrated with nausea." *Id*. In addition, Dr. Martinez increased the dosage of Ms. Martinez's continuous oral contraceptives. AR 1520, 1522.

11

At the April 16, 2019 hearing, Ms. Martinez testified that her endometriosis was one of the reasons she could not work. AR 256. She testified she had two surgeries for pelvic pain. AR 260. She stated that she was diagnosed with pelvic congestion syndrome which resulted in a surgery that inserted 16 pelvic coils on one side and 22 pelvic coils on the other side. AR 260–61. She also stated that she was diagnosed with endometriosis for which she had repeated surgeries, and for which she takes medication. *Id*. She testified that she continued to have pain despite these surgeries—which she rated as a 10 out of 10 on the pain scale. AR 260–61. She testified that she sometimes is "not able to get out of bed because [she is] having so much pain." AR 260. She explained the pain as feeling "as if I'm wrapped around in barb wire, and people are pulling at both ends." AR 260–61. She testified that this pain lasted, on average, two weeks a month, and was accompanied by fatigue and nausea. AR 261.

Despite the ample evidence in the record about Ms. Martinez's endometriosis treatment and her testimony about pain and other symptoms stemming from her endometriosis, the ALJ's RFC analysis is devoid of any mention or analysis of this impairment. *See* AR 361–66. The only mention of endometriosis in the ALJ's decision is found in the ALJ's step-two analysis:

> The claimant has been diagnosed with endometriosis, but I find this impairment to be non-severe. The claimant has been diagnosed with and treated for endometriosis (Exs. 9F at 4, 15F). At the hearing, she did not identify any work-related functional limitations associated with this impairment. As there is no indication that this impairment caused the claimant any more than minimal functional limitations,[10] I find this impairment to be non-severe.

---

[10] The fact that the ALJ concluded that Ms. Martinez's endometriosis only caused "minimal functional limitations" does not excuse the ALJ's failure to consider endometriosis in formulating Ms. Martinez's RFC. *See Wells v. Colvin*, 727 F.3d 1061, 1065 n.3 (10th Cir. 2013) (ALJ's finding that a medically determinable impairment posed only mild restrictions did not obviate need for further analysis of the impairment in formulating the RFC). In addition, the ALJ's statement that Ms. Martinez did not identify "any work-related functional limitations associated with this impairment" does not excuse the ALJ's failure to consider endometriosis in formulating Ms. Martinez's RFC. *See* 20 C.F.R. § 404.1529(c)(1) (when claimant has a medically determinable impairment that could cause pain, the ALJ must evaluate the intensity

AR 359.  The ALJ's exclusion of Ms. Martinez's non-severe impairment in assessing her RFC based on a step-two finding of non-severity is "inadequate under the regulations and the Commissioner's procedures."  *Wells*, 727 F.3d at 1069.

The ALJ was required to analyze the medical information in the record and Ms. Martinez's testimony about symptoms arising from her endometriosis.  In all cases where pain symptoms are alleged, "the RFC assessment must[] [c]ontain a thorough discussion and analysis of the objective medical and other evidence, including the individual's complaints of pain and other symptoms."  SSR 96-8p, 1996 WL 374184, at *7.  The regulations require an ALJ to "consider the limiting effects of all [a claimant's] impairment(s), even those that are not severe, in determining [a claimant's RFC]."  20 C.F.R. § 404.1545(e).   "While a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim."  SSR 96–8p, 1996 WL 374184, at *5.  Despite this requirement, the ALJ did not discuss any of the objective medical evidence regarding Ms. Martinez's endometriosis.  *See supra* pages 7–11.  Neither did the ALJ discuss Ms. Martinez's testimony about her pain and symptoms stemming from her endometriosis.  The hearing testimony clearly shows that Ms. Martinez complained of pain and limitations stemming from her endometriosis.  *See supra* at page 12.  The Court remands this case to allow the ALJ to consider the medical evidence and symptom testimony pertaining to Ms. Martinez's endometriosis when formulating her RFC.

---

and persistence of claimant's symptoms and must consider "all of the available evidence" from claimant's medical sources and nonmedical sources about how symptoms affect claimant).

Ms. Martinez alleges other errors in how the ALJ considered her pain and other symptoms in formulating her RFC. The Court does not reach these errors, as they "may be affected by the ALJ's treatment of this case on remand." *Watkins v. Barnhart,* 350 F.3d 1297, 1299 (10th Cir. 2003).

## VI.     Conclusion

In assessing Ms. Martinez's RFC, the ALJ erred by failing to consider her endometriosis, including the medical records and Ms. Martinez's testimony about her pain symptoms. The Court remands so that the ALJ can remedy this error. The Court does not address Ms. Martinez's other claims of error as they "may be affected by the ALJ's treatment of this case on remand." *Watkins*, 350 F.3d at 1299.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion to Reverse and Remand for a Rehearing (Doc. 21) is GRANTED.

**IT IS FURTHER ORDERED** that the Commissioner's final decision is REVERSED, and this case is REMANDED for further proceedings in accordance with this opinion.

_____
Laura Fashing
United States Magistrate Judge
Presiding by Consent